## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

IN RE:

ANTHONY ROBERTS                          CASE NO.: 10-31154(1)(7)
ELITA ROBERTS

_____Debtors_____

MICHAEL W. BUSH                          AP NO.: 10-03044

                    Plaintiff

vs.

ANTHONY ROBERTS

_____Defendant_____

## <u>MEMORANDUM-OPINION</u>

This matter came before the Court for trial on the Complaint of Plaintiff Michael W.

Bush ("Bush") against Defendant/Debtor Anthony Roberts ("Debtor"). The Court considered

the testimony of the witnesses and the documentary evidence submitted. For the following

reasons, the Court will enter the attached Judgment in favor of the Debtor. The following

constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of

the Federal Rules of Bankruptcy Procedure.

**FINDINGS OF FACT**

Bush maintained his living as a farmer for approximately 40 years.  He is the first cousin of the Debtor, a licensed insurance agent.  In September 2004, after discussions with Debtor regarding his desire to get into another line of work, Debtor approached Bush about going into business with him selling insurance.  Debtor told Bush they would need $35,000-$40,000 in order to set up an independent Allstate Agency.  Bush agreed to secure a line of credit with Citizens Union Bank ("CUB") and they decided to enter into an insurance business called Commonwealth Risk Management ("CRM").

On October 11, 2004, Debtor and Bush opened a business bank account at CUB for CRM.  Bush transferred $15,080.72 into the account.  When the account was opened CRM did not have a business address so they used Debtor's home address.  Although Bush maintained the account's checkbook and Debtor's name was also on the account, all of the account's statements from CUB went directly to Debtor.

Bush also opened a line of credit with CUB and secured it with 39 acres of unencumbered real property that he owned in Henry County.  Although the initial amount discussed was $35,000-$40,000 needed for the agency, Bush testified that the CUB loan officer  suggested a $100,000 line of credit.  Bush and Debtor both signed for the line of credit and were liable for the debt.  The maturity date on the line of credit was November 2, 2005.

On January 20, 2005, Debtor executed an Exclusive Agency Agreement with Allstate Insurance Company.  Debtor assigned that contract to CRM so that they could operate the Allstate agency.  Debtor also contributed his book of business and accelerated some commissions for the business.  Although Debtor drafted up corporate governance documents entitled "Consent of Directors," "Pre-incorporation Agreement," "Stock Agreement." and "Corporate Bylaws," the documents were never executed between he and Bush.  Thus, no written corporate governance documents for CRM existed.

From the outset, Debtor was to be in charge of insurance sales and the day-to-day operations of the agency.  Bush was to also work in the business and obtain his license to sell insurance.  The agency was scheduled to open in February 2005.

During the startup phase of CRM, money was transferred by Debtor from the line of credit to the business checking account.  The documentary evidence showed that money from the line of credit was used by Debtor for attending a training school on insurance in Chicago, office supplies, business expenses and draws for his own income.  The company records showed that Bush received $10,000 in income, Debtor received $17,000 in income and two workers at the agency, Laura Livingston and Malia Watts, received $13,177.84 and $20,775.72 respectively from CRM during its first year of operation.

The terms of the CUB line of credit required that it be renewed yearly.  In September 2005, Bush extended the Note and increased line of credit by $30,000 because Debtor told him they needed more money for the business.  Bush, without consulting Debtor, removed

-3-

Debtor's name from the line of credit.  Bush testified that he did this because Debtor, without his knowledge,  had used nearly the entire line of credit by taking personal draws and paying expenses of the business.

The line of credit's new maturity date was March 7, 2006.  Bush extended that maturity date to September 7, 2006.  In September 2006 Bush extended the maturity date to September 22, 2011.  Other than extending the line of credit, Bush relied on Debtor to handle the financial and accounting matters for CRM.

In April 2006, after determining that Debtor had used CRM's funds to send flowers to a funeral home for someone he did not know, he removed Debtor's name from the CRM CUB account.  Once Debtor learned that Bush had taken his name off the account he opened an account for CRM at Fifth Third Bank.  Debtor took this action because he was afraid it would disrupt CRM's business operations and he needed an account to pay business expenses.

Bush testified that Debtor provided register reports indicating how the line of credit was spent at CRM.  Bush did not question these expenditures and stated that he did not inquire or seek to review the CUB's bank statements.  It was not until after Bush had removed Debtor's name from the line of credit and increased the line of credit by an additional $30,000 that he began reviewing the CUB account statements in 2006.

-4-

Shortly thereafter, Bush left CRM and removed all of his belongings from the CRM office.  Despite this fact, Debtor continued to make payments on the CUB note.  He also continued paying Bush and Bush's father's cell phone bill.  By November 2006, Debtor removed Bush's name from the corporate filings on behalf of CRM.  By this time Bush no longer worked at the agency, had removed his personal office furnishings from CRM  and seldom came to CRM's office.  Debtor continued to operate CRM for another two years. Importantly, although his name was not on the CUB note, Debtor continued to make regularly scheduled payments on the CUB note through May 2009.

In the fall of 2008, Debtor entered into a contract with Jessica Wagner to sell CRM. Debtor received approximately $120,000 from Wagner and put these funds into a new business with James Atkisson called Diversified Financial Group, LLC.  Bush was not a party to the negotiations nor was he apprised of the terms of the sale.

On March 5, 2010, Debtor filed his Voluntary Petition seeking relief under Chapter 7 of the United States Bankruptcy Code.

On June 14, 2010, Bush initiated this adversary proceeding against Debtor.

## CONCLUSIONS OF LAW

Bush's First Amended Complaint states three causes of action seeking a declaration of nondischargeability against Debtor.  These claims are made pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4) and (a)(6).  The Court finds that the trial evidence did not support any of Bush's claims.

Exceptions to discharge are narrowly construed. This furthers the Congressional policy of the provision of a fresh start for debtors. In re Finnegan, 428 B.R. 449 (Bankr. N.D. Ohio 2010). The party seeking to have a debt declared nondischargeable bears the burden of proof by a preponderence of the evidence. Grogan v. Garner, 498 U.S. 279 (1991). Bush failed to meet his burden of proof.

In order to prove a debt is nondischargeable under 11 U.S.C. §523(a)(2)(A), the movant must show actual fraud, other than a statement respecting the debtor or an insider's financial condition. These elements must be proven: (1) the debtor obtained the money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss. In re Rembert, 141 F.3d 277, 281 (6th Cir. 1998). In support of this claim, Bush contends Debtor induced him to enter into a business relationship as an equal partner, but that his intent from the outset was never to include Bush as an equal partner. Bush claims this is supported by the fact that Debtor had only himself appointed as an agent of record with Allstate, that Roberts listed himself and his wife on the Lease Agreement for the CRM office building and that Bush gave no notice of the impending sale of CRM to Wagner.

The evidence at trial does not support Bush's claims that Debtor's intentions from the outset were to exclude him from the business. Debtor drafted corporate governance

documents for CRM for Bush's signature, but Bush failed to execute these documents. Debtor was jointly responsible for the line of credit and both he and Bush were signatories on the CUB business bank account. Bush willingly allowed Debtor to handle the business finances and Bush reviewed a register of expenses, but did not question Debtor about any expenditures. Debtor also assigned the Allstate agency contract to CRM. It was Bush who unilaterally removed Debtor's name from the line of credit and increased the amount of the line of credit. Despite Bush's claims, Debtor continued to make payments on the CUB note for two years after he was no longer legally liable on the line of credit. The trial evidence does not support any claim of misrepresentation by the Debtor.

Bush's second claim is pursuant to 11 U.S.C. §523(a)(4). Under this statute, Chapter 7 does not discharge debts that are the result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." To prevail under this statute, a plaintiff must show that (1) the debtor was acting in a fiduciary capacity; and (2) debtor committed a defalcation while acting in such capacity. In re Warford, 374 B.R. 184 (Bankr. M.D. N.C. 2007).

The law in the Sixth Circuit regarding claims seeking nondischargeability under §523(a)(4) is clear. It was set forth succinctly as follows:

> Controlling Sixth Circuit authority limits the scope of this provision to situations involving 'trustees who misappropriate funds held in trust . . . ' Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 391 (6th Cir. 2005). Claims based on a 'fail[ure] to meet an obligation under a common law fiduciary relationship' will not give rise to a nondischargeability

> judgment under §523(a)(4). Id. at 391. Thus, to obtain a judgment excepting a debt from discharge under §523(a)(4)'s defalcation provision, the creditor must establish the existence of a fiduciary relationship arising from the presence of an express or technical trust. See id.

In re Ichida, 434 B.R. 852, 859 (Bankr. S.D. Ohio 2010).

The Sixth Circuit construes the term "fiduciary capacity" more narrowly under the statute than in other circumstances. ' . . . it does not apply to someone who merely fails to meet an obligation under a common law fiduciary relationship. Accordingly, the defalcation provision applies only to those situations involving an express or technical trust relationship arising from placement of a specific *res* in the hands of the debtor." In re Bucci, 493 F.3d 635, 639-40 (6th Cir. 2007).

Bush contends that as a 50/50 partner of CRM, Debtor owed him a fiduciary duty. It may be true that Bush and Debtor created a partnership by their behavior. It was not a corporation. The corporate governance documents were never executed and Bush never objected to the draws on the line of credit by Debtor. Under Sixth Circuit authority only fiduciary relationships based on the existence of a preexisting express or technical trust whose *res* encompasses the property at issue can give rise to a defalcation-based nondischargeability claim under §523(a)(4). Plaintiff did not prove the existence of a preexisting technical or express trust. Without evidence that the funds Debtor allegedly misappropriated were from an express, technical or statutory trust, the claim fails as a matter of law.

Bush's third claim is asserted under 11 U.S.C. §523(a)(6).  In support of this claim, Bush contends Debtor willfully and maliciously injured him because he failed to pay off the CUB line of credit, but instead kept the proceeds of the sale of the agency for himself.  Bush also states that Debtor told him he knew Bush would be liable on the line of credit if he, Debtor, failed to make the line of credit payments.

Under 11 U.S.C. §523(a)(6), Bush had to prove that Debtor actually intended the injury caused, not merely intended the act that caused the injury.  Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  Unless the "actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it," a willful and malicious injury has not been committed as defined under 11 U.S.C. §523(a)(6).  In re Markowitz, 190 F.3d 455, 464 (6th Cir. 1999).  There was no evidence of an intentional and malicious injury as required by the statute.

The undisputed evidence establishes that Bush unilaterally removed Debtor's name from the line of credit and increased its amount.  Debtor continued to make payments on the line of credit long after Bush removed himself from the business and more importantly, long after Debtor was legally liable on the note.   The fact that Bush and Debtor started a new business together that did not achieve the success they both had hoped for  is not the basis for a nondischargeability action. The evidence does not support Bush's claims and they fail as a matter of law.

Finally, Debtor testified at trial that he believed that the money he drew from CRM was approximately equal to the 40% commission on sales he had generated.  He claimed that there were documents to support this, but was not sure at trial if they had been produced.  Bush's counsel moved to strike this testimony and exclude any evidence of this claim as Debtor had failed to produce any supporting documents during discovery or as exhibits to be used at trial.

Debtor had testified regarding the 40% commissions at his pre trial deposition, so the claim was not something newly formulated for trial.  Furthermore, Debtor was certainly qualified to testify regarding his personal knowledge on the commissions and his salary.  See, Wilken v. Cascadia Behavioral Healthcare, Inc., 2008 WL 44648 at p.5 (D. Oregon 2008).  He was not trying to prove the contents of any writing.  His knowledge was independent of the contents of any writing and therefore, admissible.  See, Fed R. Evid. 1002.  The Motion to Strike is, therefore, denied.

## **CONCLUSION**

For all of the above reasons, judgment in favor of Debtor/Defendant Anthony Roberts will be entered on the Complaint of Plaintiff Michael W. Bush.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

IN RE:

ANTHONY ROBERTS                         CAE NO.: 10-31154(1)(7)
ELITA ROBERTS

_____Debtors_____
MICHAEL W. BUSH                          AP NO.: 10-03044

                    Plaintiff

vs.

ANTHONY ROBERTS

_____Defendant_____


## JUDGMENT

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of Debtor/Defendant Anthony Roberts on the Complaint of Plaintiff Michael W. Bush

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motion to Strike of Plaintiff Michael W. Bush be, and hereby is, **DENIED.**

This is a final and appealable Judgment.  There is no just reason for delay.